**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| IN RE: | ) | **MDL Docket No.  1:10 MD 2197** |
| | ) | |
| **DEPUY ORTHOPAEDICS, INC., ASR** | ) | **Judge David A. Katz** |
| **HIP IMPLANT PRODUCTS** | ) | |
| **LIABILITY LITIGATION** | ) | |
| _____ | ) | |
| | ) | |
| **This document relates to:** | ) | **CIVIL ACTION NO._____** |
| | ) | |
| **DAVID BROWN,** | ) | |
| | ) | **COMPLAINT** |
| **Plaintiff,** | ) | **(Jury Trial Demanded)** |
| **v.** | ) | |
| | ) | |
| **DEPUY ORTHOPAEDICS, INC.,** | ) | |
| **DEPUY, INC.,** | ) | |
| **JOHNSON & JOHNSON SERVICES, INC.** | ) | |
| **and JOHNSON & JOHNSON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**COMPLAINT**</u>

Plaintiff David Brown, (hereinafter referred to as "Plaintiff"), an individual, files this Complaint seeking judgment against Defendants DePuy Orthopaedics, Inc., DePuy, Inc., Johnson and Johnson Services, Inc. and Johnson & Johnson (hereinafter referred to as "Defendants"), as a recipient of the recalled DePuy ASR™  XL Acetabular Hip Replacement System (collectively the "ASR Hip"). As a result of the inadequate testing of the ASR Hip that was sold by the Defendants and implanted in Plaintiff, Plaintiff has suffered, and continues to suffer, serious bodily injury and has incurred, and continues to incur, medical expenses to treat his injuries and condition.

<u>**PARTIES**</u>

1.    Plaintiff David Brown is a citizen of the State of Georgia and resides at 499 Glendalough Place SW, Atlanta Georgia, 30310.

2.    Defendant DePuy Orthopaedics, Inc. ("DePuy") is a corporation organized and existing under the laws of Indiana with its primary place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581. Defendant DePuy Orthopaedics, Inc. is a wholly owned subsidiary of Defendant Depuy Inc.

3.    At all times relevant, Defendant DePuy Orthopaedics, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the DePuy ASR hip which is subject of this lawsuit.

4.    Defendant DePuy, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 700 Orthopaedic Drive, Warsaw, Indiana 46581.  DePuy, Inc. is a subsidiary of Defendant Johnson & Johnson, Inc.

5.    At all times relevant, Defendant DePuy, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the DePuy ASR hip which is subject of this lawsuit.

6.    Defendant Johnson & Johnson Services, Inc. ("J&J") is a corporation organized and existing under the laws of New Jersey with its primary place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Defendant Johnson &

2

Johnson Services, Inc., is a subsidiary of Defendant Johnson & Johnson. As DePuy's parent company, J&J was involved in the design, manufacture, and the sale of the ASR Hip that is the subject of this lawsuit.

7.      At all times relevant, Defendant Johnson & Johnson Services, Inc. was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the DePuy ASR hip which is subject of this lawsuit.

8.      Defendant Johnson & Johnson is a corporation organized and existing under the laws of New Jersey with its primary place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. Defendant Johnson & Johnson is the parent company of Defendants Johnson & Johnson Services, Inc.  and DePuy, Inc.

9.      At all times relevant, Defendant Johnson & Johnson was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly, through third parties or related entities, numerous orthopedic products, including the DePuy ASR hip which is subject of this lawsuit.

10.      At all times mentioned, each of the Defendants was the representative, agent, employee, or alter ego of the other defendant and in doing the things alleged herein was acting within the scope of its authority as such.

11.      DePuy and J&J are collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

12.      This court has subject matter jurisdiction pursuant to 28 U.S.C.§ 1332, as the amount in controversy exceeds $75,000 exclusive of interest and costs and because Plaintiff is a citizen of the State of Georgia and Defendants are citizens of states other than the State of Georgia.

13.      Venue is conditionally proper in the United States District Court for the Northern District of Ohio pursuant to Case Management Order (CMO) No. 2 in In re:  DePuy Orthopaedics, Inc. ASR Hip Implant Products, MDL No 2917, assigned to and pending in this Court before the Honorable David A. Katz.

## FACTUAL BACKGROUND

### A.    Depuy's ASR Hip Was Not Adequately Tested

14.      Defendants' DePuy ASR Hip is a prosthetic orthopedic device used in patients in need of a hip replacement.

15.       The hip joint is where the femur connects to the pelvis. The joint is made up of the femoral head (a ball-like structure at the very top of the femur) rotating within the acetabulum (a cup-like structure at the bottom of the pelvis.) In a healthy hip, both the femur and the acetabulum are strong and the rotation of the bones against each other is cushioned and lubricated by cartilage and fluids.

16.      A total hip replacement replaces the body's natural joint with an artificial one, usually made out of metal and plastic. A typical total hip replacement system consists of four separate components: (1) a femoral stem (labeled as "hip implant" in the diagram to the above), (2) a femoral head, and (3) a liner, and (4) an acetabular shell. After the surgeon hollows out a patient's femur bone, the femoral stem is implanted. The femoral

4

head is a metal ball that is fixed on the top of the femoral stem. The femoral head forms the hip joint when it is placed inside the polyethylene liner and acetabular shell.

17.      The ASR Hip has a different design, one that puts the metal femoral ball directly in contact with a metal acetabular cup. The design of the ASR Hip was not sufficiently tested by the Defendants, and it was never approved by the FDA as being safe or effective for the products' intended purpose.

18.      At all relevant times there were safer alternative artificial hip products readily available in the market place from other manufacturers.

19.      The ASR Hip is a Class III medical device. Class III devices are those that operate to sustain human life, are of substantial importance in preventing impairment of human health, or pose potentially unreasonable risks to patients.

20.      The Medical Device Amendments to the Food, Drug, and Cosmetics Act of 1938 (MDA"), in theory, require Class III medical devices, including the ASR Hip, to undergo premarket approval by the FDA, a process which obligates the manufacturer to design and implement a clinical investigation and to submit the results of that investigation to the FDA.

21.       Premarket approval is a rigorous process that requires a manufacturer to submit what typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of the operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such

device; samples or device components required by the FDA; and a specimen of the proposed labeling.

22.      The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

23.      A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device- was not required to undergo premarket approval.

24.      In addition, a medical device marketed after the MDA's effective may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (i.e., a device approved prior to May 28, 1976). This exception to premarket approval is known as the 501(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then approve the new device for sale in the United States.

25.      The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

26.      Instead of assuring the safety of the ASR Hip through clinical trials, DePuy sought to market its ASR Hip without conducting any clinical trials by obtaining FDA approval under section 510(k). To that end, in 2005, Defendants submitted a section 510(k) premarket notification of intent to market the ASR Hip.

27.　　By telling the FDA that the ASR Hip's design was "substantially equivalent" to other hip products on the market, DePuy was able to avoid the safety review required for premarket approval under the FDA regulations including clinical trials.

28.　　In August 2005, the FDA approved the ASR Hip for sale by means of the abbreviated 510(k) process and consequently, the FDA did not require the ASR Hip to undergo clinical trials.

29.　　The 510(k) notification for the ASR Hip includes only Defendant DePuy's assertion that it "believes the DePuy ASR™ Modular Acetabular Cup System to be substantially equivalent…based upon the similarities in design, material composition, and intended use/indications for use" to devices that themselves had never been reviewed for safety and effectiveness.

30.　　Significantly, unlike the premarket approval process, the 510(k) notification process does not call for scrutiny – or even clinical testing – of a device's safety and effectiveness.

31.　　A finding of substantial equivalence is not equivalent to a finding of a device's safety and effectiveness.

32.　　This point is forcefully underscored by the FDA's August 25, 2005 letter to DePuy which says nothing about the safety and effectiveness of the ASR Hip; finds only that the device was "substantially equivalent to devices introduced into interstate commerce prior to May 28, 1976"; and concludes by stressing that the agency's determination of substantial equivalence " does not mean that FDA has made a determination that your device complies with other requirements of the Act or any Federal statutes and regulations administered by the Federal agencies."

33.     Thus, the FDA's finding of "substantial equivalence" had nothing to do with reviewing the ASR Hip's safety and effectiveness, but rather only a determination of equivalence to devices that themselves underwent safety and effectiveness review.

34.     The acronym "ASR" stands for "Articular Surface Replacement." ASR is a surgical procedure that is an alternative to a total hip replacement procedure. In an ASR procedure, only the articular surface of the hip (the acetabular cup and the femoral ball) is replaced. On the other hand, a total hip replacement includes not only the acetabular cup and femoral ball, but also a large piece of metal (known as a femoral stem) that is implanted deep into the patient's femur and on which the femoral ball is affixed.

35.     To market the ASR Hip for use in ASR surgery, the FDA would have required DePuy to undergo premarket approval, which would have required DePuy to conduct clinical trials, prove that the product is both safe and effective, and monitor the long-term safety and performance of the product once it was placed on the market.

36.      DePuy told the FDA that the components of the ASR Hip would be indicated for use in "total hip replacement procedures" and in patients with congenital hip dysplasia, slipped capital femoral epiphysis and disability due to previous fusion, where bone stock is inadequate for other reconstruction techniques", not for ASR surgeries.

37.      In short, Defendants were able to put the ASR Hip on the market in the Unites States ostensibly for use in an application for which it was not designed, a total hip replacement. To this day, despite being implanted in the bodies of thousands of Americans who believed that the devices are safe, DePuy's ASR Hip has never been approved by the FDA as being safe or effective for ASR procedures and it never conducted a typical safety review of the ASR Hip.

38.     While most hip replacements use a polyethylene plastic acetabular cup, DePuy's ASR Hip has a critical difference: it uses a metal acetabular cup. By using a metal acetabular cup and a metal femoral ball, the ASR Hip forces metal to rub against metal with the full weight and pressure of the human body. Because Defendants' defective design for the ASR Hip, hundreds of patients – including Plaintiff – have been or will be forced to undergo surgeries to replace the failed hip implants.

**B.     Notices of Hundreds of Failures led DePuy and the FDA to Finally Recall the ASR Hip**

39.     It wasn't long after DePuy launched the ASR Hip that reports of failures began flooding into DePuy. DePuy would go on to receive hundreds of similar complaints reporting that the ASR Hip failed due to premature loosening of the acetabular cup and that the failure had forced patients to undergo painful and risky surgeries to remove and replace the failed hip component. By 2007 over 100 reports had been sent to DePuy. By the end of 2008, that had skyrocketed to well over 300 reports.

40.     Consequently, DePuy was fully aware that the ASR Hip was defective and that hundreds of patients already had been injured by that defect. This is confirmed by Dr. Stephen Graves, the Director of the Australian Orthopaedic Association's National Joint Replacement Registry. Dr. Graves believes that the data available to DePuy had shown for some time that the ASR had been failing early at a significantly higher rate than its competitors' devices.

41.     The defect in the ASR Hip appears to be design-related. Several orthopedic specialists have opined that the design of the ASR acetabular cup, which is shallower than acetabular cups made by other companies, is at the heart of the ASR Hip's problems.

9

For example, Dr. Harlan C. Amstutz, an orthopedic surgeon in Los Angeles who designs hip implants said that she believed that the design of the ASR Hip is prone to problems.

42.     Even the surgeon who designed the ASR Hip, Dr. Thomas Schmalzried, admitted that DePuy had known since 2008 that the ASR Hip's cup may have problems. The New York Times reported in March 2010 that "Dr. Schmalzried said in a recent interview that she and DePuy officials realized within the last two years that the[ ASR Hip's] cup might be more of a challenge to implant properly than competing cups." According to Dr. Schmalzried, "The window for component position that is consistent for good, long-term clinical function is smaller for the [ ASR Hip]," than other cups.

43.     Despite its knowledge that the ASR Hip had a defect and it had failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery. DePuy continued selling the defective hip implant. In so doing, DePuy actively concealed the known defect from doctors and patients – including Plaintiff and his doctor – and misrepresented that the ASR Hip was a safe and effective medical device.

44.     In 2009 alone, DePuy brought in more than $5.4 billion in sales. Hip implant sales are critically important to DePuy's parent company, Johnson & Johnson, and DePuy is one of Johnson & Johnson's most profitable business groups.

45.     In March 2010, DePuy finally began to disclose some of the alarming information about the ASR Hip. It sent a letter to doctors warning them of the increased failure rate associated with the ASR Hip. DePuy admitted that the ASR Hip suffered from a "higher than expected revision rate," and that data compiled by the Australian National Joint Replacement Registry showed that 5.4 percent of the ASR Hips implanted had been surgically replaced after only three years and that the expected failure rate could be as

high as 10 percent. The letter also stated that DePuy was planning to stop selling the ASR Hip, allegedly because of "declining demand."

46.      On July 17, 2010, the FDA announced a nationwide recall related to the DePuy ASR Hip. The FDA classified this recall as a Class 2 Recall. A Class 2 Recall includes situations where exposure to a violative product could cause a situation in which use of or exposure to a violative product may cause medically reversible adverse health consequences.

47.      DePuy, on August 25, 2010, confirmed that in the first five years after implantation, approximately 12% of patients (1 in 8) who had received the ASR resurfacing device and 13% (1 in 8) who had received the ASR total hip replacement needed to have a revision surgery.

48.      DePuy also confirmed that at least 93,000 people have had ASR Hips implanted in their bodies, meaning that over time; at least 11,700 people will have an ASR Hip failure and be forced to undergo a painful surgery to remove and replace it.

49.      Most recently, on August 26, 2010, DePuy issued a worldwide recall of its ASR™ XL Acetabular Hip Replacement System and ASR™ Hip Resurfacing System and all components for these devices due to the high percentage of patients who needed to undergo a complex, risky, and painful surgery (known as "revision surgery").

**C.     Mr. Brown's ASR Hip was Defective and Has Failed, Forcing Him to Endure an Additional Painful and a Potential Risky Revision Surgery**

50.      On November 15, 2007, Mr. Brown underwent a surgical procedure to implant an ASR Hip on his left side, which was subsequently part of the DePuy ASR recall in August 2010.

51.     By November 15, 2007, the date of Mr. Brown's hip replacement surgery, Defendants were on notice that the ASR Hip was defective. It would be another thirty-two (32) months before DePuy would disclose the safety issue to Mr. Brown, his physician, or the public, and recall the ASR Hip due to its high failure rate.

52.     Since Mr. Brown's surgical implant of the ASR Hip, Plaintiff has recently began to suffer and continues to suffer symptoms including, but not limited to pain, weakness, and difficulty with even simple daily activities. Additionally, Mr. Brown has the risk of elevated levels of cobalt and chromium metal ions in his blood stream as a result of the metal on metal implants and said risk is greatly increased due to the defective nature of the DePuy ASR Hip implants. The increased presence of said metal ions in the Plaintiff's bloodstream can cause significant health problems while subjecting the Plaintiff to increased medical diagnosis and treatments.

53.     Had Mr. Brown known that the ASR Hips caused pain, weakness, and difficulty with even simple daily activities and the probable need for revision surgery to explant his device, Mr. Brown would not have elected to have the ASR Hip device implanted.

54.     In January 2011, Mr. Brown's physicians began to discuss a revision in the near future due to constant pain and potential elevated metal ions.

55.     As a direct and proximate result of the implantation of the ASR Hip Plaintiff has suffered significant harm, including but not limited to physical injury and bodily impairment, debilitating lack of mobility and consistent and continual pain and suffering. In addition, because of the faulty nature of the ASR Hip device, Mr. Brown is going to have to undergo revision surgery to explant the faulty ASR Hip system.

56.     Revision surgeries are generally more complex than the original hip replacement surgery, often because there is a reduced amount of bone in which to place the new hip implants. Revision surgeries also usually take longer than the original hip replacement surgery and the revision surgery has a higher rate of complications. Additionally, if metal particles/debris from the ASR Hip are present, the revision surgery is more difficult.

57.     Mr. Brown will need many years of continuous medical treatment as a direct and proximate cause of the faulty ASR Hip system implant.

**D.     The Defective ASR Hip And The Defendants' Conduct Caused Permanent Injuries And Substantial Damages to Mr. Brown**.

58.     To have to undergo revision surgery would subject Mr. Brown to much greater risks of future complications than he had before the revision surgery. For example, several studies have found that revision surgery has a much higher risk of dislocation compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared to 3.9 percent of patients who underwent an original hip replacement surgery. In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer a hip dislocation than those who have not. (Phillips CB, ET AL. Incidence rates of dislocation, pulmonary embolism, and deep infection during the first six months after elective total hip replacement. American Journal of Bone and Joint Surgery 2003; 85:20-26.)

59.     As a direct and proximate result of failure of his defective ASR Hip and the Defendants' wrongful conduct, Mr. Brown sustained and continues to suffer economic

damages (including medical and hospital expenses), severe and possibly permanent injuries, pain, suffering and emotional distress. As a result, Mr. Brown has sustained and will continue to sustain damages in an amount to be proven at trial.

## COUNT I

## <u>NEGLIGENCE</u>

60.      Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as it fully set forth herein.

61.      Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling ASR Hip.

62.      Defendants failed to exercise due to care under the circumstances and therefore breached this duty by:

  a.  Failing to properly and thoroughly test ASR Hip before releasing the device to market;

  b.  Failing to properly and thoroughly analyze the data resulting from the pre-marketing tests of ASR Hip;

  c.   Failing to conduct sufficient post-market testing and surveillance of ASR Hip;

  d.   Designing, manufacturing, marketing, advertising, distributing, and selling ASR Hip to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of ASR Hip and without proper instructions to avoid the harm which could forseeably occur as a result of using the drug;

  e.   Failing to exercise due care when advertising and promoting ASR Hip; and

14

  f. Negligently continuing to manufacture, market, advertise, and distribute ASR Hip after Defendants knew or should have known of its adverse effects.

63. Plaintiff was injured as a direct and proximate result of Defendants' actions, omissions, and misrepresentations. Plaintiff has incurred, and will continue to incur expenses as a result of using ASR Hip.

64. Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example to others, and to deter these Defendants and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally in such amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT 11

## PRODUCTS  LIABILITY – FAILURE TO WARN

65. Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

66. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the ASR Hip and, in the course of same, directly advertised or marketed the product to the FDA, health care professionals, and consumers, or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of the ASR Hip.

67.     Defendants failed to adequately warn health care professionals and the public, including Plaintiff and his physician, of the true risks of the ASR Hip, including that the ASR Hip could loosen and separate from the hip socket or become mal-positioned, causing severe pain and injury, and requiring further treatment, including revision surgery and/or replacement.

68.     Defendants failed to provide timely and reasonable warnings regarding the safety and efficacy of the ASR Hip. Had they done so, proper warnings would have been heeded and no health care professional, including Plaintiff's physician, would have used the ASR Hip and no patient, including Plaintiff, would have had the ASR Hip implanted.

69.     Defendants failed to provide timely and reasonable instructions and training concerning safe and effective use of the ASR Hip to either Plaintiff or his physician.

70.      The ASR Hip, which was researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold and otherwise released into the stream of commerce by Defendants, was defective due to inadequate post-marketing warnings and/or instruction because Defendants failed to provide adequate warnings to health care professionals and the consuming public, including Plaintiff, and continued to aggressively promote the ASR Hip.

71.      Defendants failed to perform or otherwise facilitate adequate testing, failed to reveal or concealed testing and research data, or selectively and misleadingly revealed or analyzed testing and research data.

72.     As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT III

## PRODUCTS LIABILITY – DEFECTIVE DESIGN

73. Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

74. Defendants are the researcher, developer, manufacturer, distributor, marketer, promoter, supplier and seller of the ASR Hip, which is defective and unreasonably dangerous.

75. The ASR Hip is defective in its design or formulation in that it is not reasonably fit, suitable or safe for its intended purpose and/or its forseeable risks exceed the benefits associated with its design. The ASR Hip is defective in design in that it lacks efficacy, poses a greater likelihood of injury and is more dangerous than other available devices indicated for the same conditions and uses.

76. If the design defects were known at the time of manufacture, a reasonable person would have concluded that the utility of the ASR Hip did not outweigh its risks.

77. The defective condition of the ASR Hip rendered it unreasonably dangerous and/or not reasonable safe, the ASR Hip was in this defective condition at the time it left the hands of the Defendants. The ASR Hip was expected to and did reach Plaintiff and his physician without substantial change in the condition in which it was designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied and otherwise released into the stream of commerce.

17

78.     Plaintiff was unaware of the significant hazards and defects in the ASR Hip. The ASR Hip was unreasonable dangerous and/or not reasonably safe in that it was more dangerous than would be reasonably contemplated by the ordinary patient or physician. During the period that Plaintiff used the ASR Hip, it was being utilized in a manner that was intended by Defendants. At the time Plaintiff had the ASR Hip implanted it was represented to be safe and free from latent defects.

79.     Defendants are strictly liable to Plaintiff for designing, manufacturing, and placing into the stream of commerce the ASR Hip, which was unreasonably dangerous for its reasonably forseeable uses because of its design defects.

80.     Defendants knew or should have known of the danger associated with the use of the ASR Hip, as well as the defective nature of the ASR Hip, but has continued to design, manufacture, sell, distribute, market, promote and/or supply the ASR Hip so as to maximize sales and profits at the expense of the public health and safety, in conscious disregard of the forseeable harm cause by the ASR Hip.

81.     As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT IV

## **BREACH OF EXPRESS WARRANTY**

82.      Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

83.      Defendants advertised, labeled, marketed and promoted its product, the ASR Hip, representing the quality to health care professionals, the FDA, Plaintiff, and the public in such a way as to induce its purchase or use, thereby making an express warranty that the ASR Hip would conform to the representations. More specifically, Defendants represented that the ASR Hip was safe and effective for use by individuals such as Plaintiff or that it was safe and effective to treat Plaintiff's condition.

84.      The representations, as set forth above, contained or constituted affirmations of fact or promises made y the seller to the buyer which related to the goods and became part of the basis of the bargain creating an express warranty that the goods shall conform to the affirmations of fact or promises.

85.      The ASR Hip did not conform to the representations made by Defendant in that the ASR Hip was not safe and effective, was not safe and effective for use by individuals such as Plaintiff, and/or was not safe and effective to treat in individuals, such as Plaintiff.

86.      At all relevant times, Plaintiff used the ASR Hip for the purpose and in the manner intended by Defendants.

87.      Plaintiff and Plaintiff's physician, by the use of reasonable care, would not have discovered the breached warranty and realized its danger.

88.      The breach of warranty was a substantial factor in bringing about Plaintiff's injuries.

19

89.      As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT V

## BREACH OF IMPLIED WARRANTY

90.      Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

91.      The ASR Hip was not reasonably fit for the ordinary purposes for which such goods are used and did not meet the expectations for the performance of the product when used in the customary, usual and reasonably forseeable manner. Nor was the ASR Hip minimally safe for its intended purpose.

92.      At all relevant times, Plaintiff used the ASR Hip for the purpose and in the manner intended by Defendants.

93.      Plaintiff and Plaintiff's physician, by the use of reasonable care would not have discovered the breached warranty and realized its danger.

94.      Defendants' breach of the implied warranty was a substantial factor in bringing about Plaintiff's injuries.

95.      As a direct result of Defendants' conduct, Plaintiff has suffered and continues to suffer serious and permanent non-economic and economic injuries and Defendants are liable to Plaintiff in an amount to be determined at trial.

WHERFORE, Plaintiff demands judgment against Defendants jointly and severally in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VI

## FRAUDULENT MISREPRESENTATION

96.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

97.     Defendants made fraudulent misrepresentations with respect to the ASR Hip in the following particulars:

a.  Defendants represented through the labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that ASR Hip had been tested and found to be safe and effective for the treatment of pain and inflammation; and

b.  Defendants represented that ASR Hip was safer than other alternative hip devices.

98.     Defendants knew that their representations were false, yet they willfully, wantonly, and recklessly disregarded their obligation to provide truthful representations regarding the safety and risk of ASR Hip to consumers, including Plaintiff, and the medical community.

99.     The representations were made by Defendants with the intent that doctors and patients, including Plaintiff, rely upon them.

100.     Defendants' representations wee made with the intent of defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and encourage the sale of ASR Hip.

101.     Plaintiff and his physicians did in fact rely upon the representations.

102.     Defendants' fraudulent representations evinced its callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

103.      Plaintiff was injured as a direct and proximate result of Defendants' actions, omissions, and misrepresentations. Plaintiff has incurred and will continue to incur expenses as a result of using ASR Hip.

104.     Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants for their conduct, in an amount sufficiently large to be an example to others, and to deter these Defendants and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff demands judgment against Defendants jointly and severally in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## COUNT VII

### FRAUDULENT CONCEALMENT

105.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

106.     Defendants fraudulently concealed information with respect to the ASR Hip in the following particulars:

     a.  Defendants represented through the labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory

submissions that ASR Hip was safe and fraudulently withheld concealed information about the substantial risks of using ASR Hip; and

b. Defendants represented that ASR Hip was safer than other alternative medications and fraudulently concealed information which demonstrated that ASR Hip was not safer than alternatives available on the market.

107. Defendants had sole access to material facts concerning the dangers and unreasonable risks of ASR Hip.

108. The concealment of information by Defendants about the risks of ASR Hip was intentional, and the representations made by Defendants were known by Defendants to be false.

109. The concealment of information and the misrepresentations about ASR Hip were made by Defendants with the intent that doctors and patients, including Plaintiff, rely upon them.

110. Plaintiff and his physicians relied upon the representations and were unaware of the substantial risks of ASR Hip which Defendants concealed from the public, including Plaintiff and his physicians.

111. Plaintiff was injures as a direct and proximate result of Defendants' actions, omissions, and misrepresentations. Plaintiff has incurred, and will continue to incur expenses as a result of using ASR Hip.

112. Defendants acted with oppression, fraud, and malice towards Plaintiff, who accordingly requests that the trier of fact, in the exercise of its sound discretion, award additional damages for the sake of example and for the purpose of punishing Defendants

for their conduct, in an amount sufficiently large to be an example to others, and to deter these Defendants and others from engaging in similar conduct in the future.

WHEREFORE, Plaintiff demands judgment in his favor against Defendants as follows:

A.    Awarding Plaintiff past and future medical and incidental expenses, according to proof;

B.    Awarding Plaintiff past and future loss of earnings and/or earning capacity, according to proof;

C.    Awarding Plaintiff past and future general damages, according to proof;

D.    Awarding punitive and exemplary damages in an amount to be determined at trail;

E.    Awarding disbursements and expenses of this action, including reasonable counsel fees and other appropriate relief;

F.    Awarding prejudgment and post judgment interest; and

G.    Granting such other and further relief as is just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

This the 28th day of March, 2011

By: _/s/ Bobby J. Bell Jr._____
        BOBBY J. BELL JR.
        Attorney for Plaintiff
        Hollis, Wright & Harrington P.C.
        505 North 20th Street, Ste. 1500
        Birmingham, AL 35203
        Telephone: (205) 324-3600
        Facsimile: (205) 324-3636
        Email: bob@hollis-wright.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28th, 2011, a copy of the foregoing complaint was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.

    /s/ Bobby J. Bell, Jr.
BOBBY J. BELL JR. (BEL047)
Attorney for Plaintiff
Hollis, Wright & Harrington P.C.
505 North 20th Street, Ste. 1500
Birmingham, AL 35203
Telephone: (205) 324-3600
Facsimile: (205) 324-3636
Email: bob@hollis-wright.com